## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WILLIE BEASLEY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-9925** |
| **DARREL VANNOY, WARDEN** | **SECTION: "F"(5)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Willie Beasley, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On April 9, 2009, he was charged with second-degree murder by grand-jury indictment.[1]    In October 2010, his motions to

---

[1]  State Rec., Vol. 1 of 8, Grand Jury Indictment, Orleans Parish.

suppress were denied.[2]    In March 2011, a jury found him guilty of second-degree murder.[3] In May 2011, he was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.[4]

On direct appeal, he asserted that the evidence was insufficient to support his conviction and that the trial court erred in excluding evidence of the victim's prior attempted murder conviction.    On September 26, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.[5]    On April 12, 2013, the Louisiana Supreme Court denied his application for writ of certiorari.[6]

The docket master reflects that the state district court received an application for post-conviction relief from Beasley on September 6, 2013.[7]    In that application, he claimed that trial counsel was ineffective for denying him the right to testify and impeding his ability

---

[2]  State Rec., Vol. 1 of 8, Minute Entry, 10/8/10.

[3]  State Rec., Vol. 1 of 8, Minute Entry, 3/23/11.

[4]  State Rec., Vol. 1 of 8, Minute Entry, 5/31/11.

[5]  *State v. Beasley*, 2011-KA-1497, 2012 WL 6619325 (La. App. 4 Cir. 9/26/12); State Rec., Vol. 7 of 8.

[6]  *State v. Beasley*, 2012-KH-2440 (La. 4/12/13), 111 So.3d 1017; State Rec., Vol. 7 of 8.    His supervisory writ, filed pro se, was signed and dated November 2, 2012. State Rec. Vol. 8 of 8. The Supreme Court letter acknowledging receipt reflected a postmark date of November 5, 2012 and filing date of November 14, 2012. State Rec., Vol. 7 of 8 (letter dated November 14, 2012).

[7]  State Rec., Vol. 1 of 8, Docket Master Entry, 9/6/13. The PCR application is unsigned and undated. State Rec., Vol. 8 of 8. No file stamp appears on the document.

to present his defense.    On June 2, 2015, the state district court denied relief.[8]    By letter dated November 28, 2017, he explained to the court of appeal that he mistakenly sent his supervisory writ application to the state district court.    The first supervisory writ application was returned to him unfiled with a December 2017 letter from the appellate court instructing him to include a copy of his PCR application and the judgment with his writ application.[9]    His supervisory writ application bearing the necessary documentation was stamped as filed on January 5, 2018.[10]    The application bears a signature date of 2015.[11] On February 6, 2018, the court of appeal denied relief on the merits.[12]    On March 5, 2018, Beasley submitted his supervisory writ application to prison officials for filing with the Louisiana Supreme Court.[13]    On March 6, 2019, the Louisiana Supreme Court denied relief.[14]

---

[8]  State Rec., Vol. 8 of 8, Post-Conviction Relief Judgment, 6/2/15.

[9]  State Rec., Vol. 8 of 8.

[10]  State Rec., Vol. 8 of 8, No. 2018-K-0011.

[11]  The certificate of service appears to have been signed on 7/21/15.    A docket master entry reflects that on September 11, 2015, the state district court received a letter intended for the Louisiana Fourth Circuit. State Rec., Vol. 1 of 8.

[12]  State Rec., Vol. 8 of 8, *State v. Beasley*, 18-KH-0011 (La. App. 4th Cir. Feb. 6, 2018).

[13]  State Rec., Vol. 8 of 8, No. 18-KH-0376. The application reflects a certificate of service signed by Beasley on March 5, 2018 and a stamp that it was scanned and emailed by LSP on March 6, 2018.

[14]  *State v. Beasley*, 2018-KH-0376 (La. 3/6/19), 264 So.3d 1199; State Rec., Vol. 8 of

On April 29, 2019, Beasley filed the instant federal application for habeas corpus relief.[15]    He asserts three claims for relief:    (1) excluding evidence of the victim's prior attempted murder conviction violated his right to due process and ability to present a defense; (2) the state failed to present sufficient evidence to support the conviction; and (3) trial counsel was ineffective for denying him the right to testify at trial.[16]    The State has filed a response arguing that the federal petition is untimely.[17]

**Preliminary Review – Timeliness and Exhaustion**

As a preliminary matter, the Court considers and rejects the State's argument for dismissal based on untimeliness for the following reasons.    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."[18]    With regard to finality, the United States Fifth Circuit Court of Appeals

---

8.

[15]  Rec. Docs. 1, 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[16]  Rec. Doc. 3, p. 24.

[17]  Rec. Doc. 9.

[18]  Title 28 U.S.C. § 2244(d) provides additional grounds, which do not apply here:

(1)    A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

    A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such

has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338-39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693. Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment

---

      review;

B.      the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C.      the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

of the court of appeal."

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).    Regarding statutory tolling, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."    28 U.S.C. § 2244(d)(2).

The court of appeal affirmed Beasley's conviction on September 26, 2012.    Under state law, he had until October 26, 2012 to file his application for writ of certiorari with the Louisiana Supreme Court.    The State contends the conviction became final, and Beasley's one-year federal limitations period commenced, 30 days after the court of appeal affirmed his conviction on direct appeal *i.e.,* on October 26, 2012, when Beasley's time for filing his application for writ of certiorari with the Louisiana Supreme Court expired.    The state court record confirms that Beasley was notified of the ruling by appellate counsel, who informed him that he had 30 days from the date of the decision to file a writ application with the Louisiana Supreme Court.[19]    The state-court record reflects that Beasley's Louisiana Supreme Court writ application was not signed and dated until November 2, 2012, which is beyond the 30-day window.[20]    *See Butler v. Cain*, 533 F.3d 314, 318-320 (5th Cir. 2008) (untimely direct-review writ applications do not toll the federal limitations period);

---

[19]    State Rec., Vol. 8 of 8 (letter dated October 2, 2012).

[20]    State Rec., Vol. 8 of 8, La. S.Ct. Writ No. 12-KK-2440.

*Richardson v. Cain*, 628 F. Appx. 304 (5th Cir. 2016).    Without assigning reasons, the Louisiana Supreme Court subsequently denied his application for writ of certiorari.

According to the State's calculations, Beasley then tolled the federal limitations period by filing his post-conviction relief application with the state district court on September 6, 2013.    The time remained tolled while post-conviction relief proceedings were pending but began running again once the Louisiana Supreme Court denied relief on March 6, 2019.    At this point, the State submits that he had 51 days remaining, or a deadline of Friday, April 26, 2019, to file his federal application.[21]    Beasley signed and dated his federal application April 29, 2019.

The Court cannot adopt the State's calculations.    The State acknowledges that the mailbox rule must be applied to determine the proper filing date for state-court prisoner filings.    Under Louisiana's "mailbox rule," the filing date of a prisoner-filed document is neither the postmark date nor the receipt date; rather, it is the date the prisoner "placed [his application] in the prison mail system."    *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). The State admits that the relevant filing date for Beasley's state district court post-conviction relief application pursuant to the mailbox rule does not appear anywhere in this state-court

---

[21]  The State's response mistakenly identifies a deadline of "Friday, April <u>24</u>, 2019." Rec. Doc. 9, p. 6.    However, April 24, 2019 was a Wednesday.    Calculating 51 days from the Louisiana Supreme Court's denial on March 6, 2019, results in the deadline of Friday, April <u>26</u>, 2019.

record.[22]    The post-conviction relief application included in the record is not dated or signed by Beasley.    The application has no file-date stamp.    The docket master entry for September 6, 2013 states simply, "Clerk's office received uniform application for post-conviction relief."[23]    With the State's calculations showing the instant federal application was filed one day late, the State requests that the Court presumptively adopt the filing date of September 6, 2013, as identified by the trial court as the date of receipt and then reiterated by Beasley in subsequent state-court writ applications.    However, the Court is unable to do so.    It is certainly plausible that the application was delivered to prison officials or placed in the prison mail system earlier than the date it was received by the state district court. The exact date need not be determined because even one day earlier renders the instant federal petition timely, by the State's own calculations, through statutory tolling.    Under the circumstances, the Court declines to find the instant federal application untimely and will consider the claims on the merits.

The State also submits that the two claims raised on direct appeal are unexhausted and technically procedurally defaulted because Beasley could not have "fairly presented" the claims to the Louisiana Supreme Court in an untimely direct-review application and they would now be procedurally barred in the state courts.    However, the State offers no clear precedential support for its assertion that a facially untimely direct-review writ application,

---

[22]    Rec. Doc. 9, p. 2 n. 5 and p. 5, n. 10.

[23]    State Rec., Vol. 1 of 8, Docket Master.

presenting the two claims at issue and denied without reasons assigned, fails to satisfy

exhaustion principles.[24]    The procedural bar asserted by the State is based on Beasley's

alleged failure to exhaust.    Thus, out of an abundance of caution, the Court declines to

decide this petition on the uncertain procedural grounds urged by the State and turns

instead to the merits.    Furthermore, this Court has authority to deny on the merits even

potentially unexhausted claims raised in a federal habeas petition.[25]    28 U.S.C. §

2254(b)(2).

## Facts

On direct appeal, the Louisiana Fourth Circuit briefly summarized the facts adduced

at trial:

> Darrell Scott was shot and killed on the morning of February 16, 2009, while
> standing outside the door to his apartment building at 8302 Jeannette Street,
> in New Orleans. An autopsy revealed that Mr. Scott sustained two gunshot
> wounds, one to his left upper chest that passed through his heart and lodged
> in his spinal column, and the other to his groin and buttocks which passed

---

[24]    The State cites two federal district court cases for the general proposition that a claim presented in an untimely writ application has not been "fairly presented" for exhaustion purposes.    *Jackson v. Vannoy*, Civ. Action 17-00265, 2018 WL 1441154, at *6-7 (E.D. La. Feb. 27, 2018); *Lee v. Cain*, Civ. Action 13-2508, 2014 WL 4967128, at *3 (E.D. La. Oct. 3, 2014).    However, neither case presented the instant scenario.    *Jackson* involved a supervisory writ application filed on collateral review that the Louisiana Supreme Court refused to consider expressly finding the application untimely under La. S. Ct. Rule X § 5. *Lee* involved an intermediate court of appeal ruling on post-conviction stating expressly that it would not consider the supervisory writ application, which was not properly filed in accordance with the uniform rules of the courts of appeal.

[25]    When reviewing an unexhausted claim on the merits, the AEDPA's deferential standard of review does not apply. Instead, the federal courts review unexhausted claims under a *de novo* standard.    *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

through the nerves and muscles in the back of his right leg. At trial, Dr. Cynthia Gardner, the forensic pathologist who performed Mr. Scott's autopsy, testified that the injuries to his heart resulted in massive blood loss, which would have affected his ability to breathe, while the second wound would have affected his ability to move. Dr. Gardner estimated that death occurred within minutes of the shooting. She also stated that due to the lack of gunpowder residue, Mr. Scott was shot from a distance of more than two feet. She testified that a drug screen tested negative, but Mr. Scott's blood alcohol level was .251, more than three times the legal limit. Dr. Gardner stated that the victim would have been impaired, but she could not guess at what state he would be functioning because she did not know his alcohol history. She also indicated, in response to defense questioning, that Mr. Scott had tattoos, including one that read "Mad Dog."

Ms. Erica Scott testified that she was Mr. Scott's sister, and he was forty-five years old and living on Jeannette Street at the time of his death. She testified that she spoke with him at approximately 10:45 a.m. on the morning of the murder, and he did not sound mad or upset. On cross-examination, Ms. Scott admitted that her brother drank, but she testified that he had stopped drinking after going through rehabilitation. She testified that she did not know why his blood alcohol level was so high at his death. She identified a photograph of Mr. Scott that was taken the same year that he died.

Detective Nathan McGeehee testified that at approximately 11:00 a.m., on the morning of the murder, he was notified of a shooting at 8303 Jeannette Street. He further testified that other officers were on the scene by the time he arrived, and the victim had been taken to the hospital, where he was pronounced dead. Det. McGeehee identified various photographs depicting the scene of the shooting. He testified that he saw two shell casings and a hat that were laying at the front door where Mr. Scott had been shot. He testified that after speaking with people on the scene, he went to the shed of the house across the street from the shooting. He testified that inside the shed was a washroom, where he found a bag containing a gun.

Ms. Danette Atkinson was Mr. Scott's girlfriend. She admitted having prior convictions for theft from six years earlier, and possession of cocaine from sixteen years earlier. She testified that she met Mr. Scott while they were both at Odyssey House, and she moved in with him at his residence after she was released from the program, which she testified was approximately three weeks before his murder. She identified the defendant Willie Beasley, whom

she knew as "Youngster" and who also lived in the neighborhood. She testified that she usually saw Beasley in the neighborhood every day, but she denied seeing Beasley arguing or communicating with Mr. Scott during Mr. Scott's stay in the neighborhood. She identified photographs taken from the upstairs apartment that she shared with Mr. Scott, one of which depicted a window that overlooked the street, and she testified that Mr. Scott spent a lot of time looking out the window.

Ms. Atkinson testified that she left the apartment early on the morning of the murder, but she returned around 10:30 a.m. She testified that Mr. Scott was talking on the phone and appeared to be in a good mood, which she attributed to the fact that he was soon going to the dentist to get his new teeth. She testified that Mr. Scott left the apartment around 11:00 a.m., while she stayed upstairs watching television. She testified that she almost immediately heard two gunshots, and she looked out the window and saw Beasley running into the alley of the house across the street, holding a gun in his hand. She insisted that she heard no arguing before the gunshots, and when she went downstairs, she found Mr. Scott on the ground outside the door, and his keys were still in the door's keyhole. She testified that she grabbed Mr. Scott's cellphone out of his pocket and made the 911 call.[26] She testified that she took Mr. Scott's keys out of the door. She testified that Mr. Scott was having trouble breathing and could not talk. She further testified that she was hysterical when the police arrived, but she pointed out where she had seen Beasley go after the shooting. She testified that she later viewed a lineup at the Homicide Office from which she chose Beasley's photo.

On cross-examination, Ms. Atkinson admitted that she did not know if Mr. Scott and Beasley knew each other. She admitted that she had an open prostitution case in which she had been found incompetent to proceed, but she testified that she was really depressed on the day that she was found incompetent to proceed. She insisted, however, that she had regained her competency by the time of Beasley's trial. She denied having anything to drink on the morning of the shooting, nor did she see Mr. Scott drinking anything that morning, but she admitted that they had continued drinking after completing rehab. She denied that either of them used drugs. She testified that she had probably given a statement to the police, but she denied telling the detective that Mr. Scott and Beasley were arguing on the morning of the shooting. On redirect, Ms. Atkinson reiterated that she saw Beasley running

---

[26] After authentication by the custodian, the State played the 911 tape of the murder.

away after the shooting.

After the jury viewed the scene, the State called Detective Dacinda Barnes, who investigated the shooting. She testified that the victim had been taken from the scene by the time she was directed there, but she observed a black baseball cap and two spent casings on the ground adjacent to the steps at 8302 Jeannette Street. Det. Barnes testified that Ms. Atkinson had been taken to the Homicide Office. She further testified that Beasley had been detained at 8301 Jeannette Street, along with two females and another male. Det. Barnes advised Beasley of his rights and that he was under investigation for a homicide. She testified that Beasley indicated that he understood his rights, but he insisted that he had been asleep inside the residence at the time of the shooting and did not know anything about it. Det. Barnes testified that she also spoke with the women in the house, and that she obtained a search warrant for the house, but a search of the house itself revealed no evidence. She testified that the warrant was re-executed after she reviewed a video of statements that Beasley made to his mother while he was being detained in the back seat of a police unit. In this video, played for the jury and made an exhibit in this case, Beasley told his mother, among other things, that the only gun he had "around" the area was one that the police did not find and that was hidden in the shed or garage, all the way in the bottom of something that is unintelligible.[27]  Det. Barnes testified that during the second search, officers went to a dryer inside the shed of the residence where Beasley had told his mother that he had hidden a gun, and they recovered the weapon. Det. Barnes testified that the gun matched casings taken from the scene and was found to be the murder weapon.

Det. Barnes testified that after finding the gun, she spoke with Beasley again. She testified that she re-advised him of his rights, explaining them from a waiver form that he signed after indicating that he understood his rights. She testified that she then took a formal statement from Beasley, as well as one from his mother. The State then played Beasley's statement for the jury.

---

[27]  In the video, Beasley also mentioned that he told the police that he was asleep at the time of the shooting and that it "always" was his story. He explained to his mother that he did not do anything and that there were two or three other guys with dreadlocks in the neighborhood who looked like him. He stated that a gun was found in the yard that was not his. He also told his mother that the victim used crack cocaine, drank, and fussed with others in the neighborhood. He then stated that an officer was trying to read his lips.

In his statement, which was taken on the evening of the shooting, Det. Barnes again advised Beasley of his rights, which he indicated he understood. He stated that he had been staying with his girlfriend's grandfather, who lived across the street from the victim. He stated that two days earlier, the victim asked him if he had any drugs, and when Beasley told him that he did not sell drugs, the victim "went off" on him. Beasley stated that he argued back with the victim and then walked away. Beasley indicated that he passed the victim's residence often on his way to a store, and the victim often stood outside his residence, calling him names and telling Beasley that he had a gun. Beasley stated that he felt threatened by the victim, who had pulled a gun on him two or three days prior to the shooting.

Beasley stated that on the morning of the shooting, the victim again yelled at him, insinuating that he was going to kill or harm Beasley. Beasley stated that it looked to him like the victim was going to try to attack him, and Beasley pulled his own gun and shot the victim twice. He stated that he then left the scene and went around the corner; he denied walking down the alleyway next to his residence. He first stated that he hid the gun in the yard, but then he stated that he hid it in the dryer in the shed. He admitted that he and the victim did not engage in a physical altercation before the shooting, but he nonetheless felt threatened because of the way that the victim was talking to him, and also because the victim had pulled the gun on him a few days prior to the shooting. He stated that the victim's actions made him worried for not only his safety, but also that of his girlfriend and his young daughter. He stated that it looked to him like the victim was going to try to get his gun from inside his residence. Beasley stated that he often saw people drive up to the victim's house, and he figured that the victim was involved in drug sales. Beasley stated that the victim also tried to get him to sell drugs for him and also asked Beasley where he could get drugs. Beasley stated that the victim also yelled at everyone in the neighborhood, and the victim had fights with a few people. Beasley then agreed that his statement was not the product of any promises, coercion, or force.

On cross-examination, after the State played Beasley's statement for the jury, Det. Barnes testified that she did not remember Ms. Atkinson telling her that Mr. Scott and Beasley argued on the morning of the shooting. After being shown the affidavit for the search warrant for the residence where Beasley lived, which stated that a witness said that "they" looked outside and saw the shooter arguing with the victim, Det. Barnes responded that she did not prepare the affidavit. She also testified that she did not remember any other

witness telling her about witnessing an argument between the two men. The defense attorney also presented Det. Barnes with her testimony from a pretrial suppression hearing, where she was asked if anywhere in the affidavit Ms. Atkinson indicated that there was an argument between the two men, and Det. Barnes responded at that time yes, but Ms. Atkinson said that she did not hear the nature of the argument.

Det. Barnes testified that Beasley told her that he walked around the corner to get to the back of the house where he was staying, not down the alleyway as Ms. Atkinson told her, and officers found the gun where he said he had hidden it. She testified that Beasley told her that he was afraid of the victim because the victim had recently pulled a gun on him, and it looked like the victim was going to try to get his gun.

On redirect and after being shown Ms. Atkinson's statement, Det. Barnes testified that Ms. Atkinson made no mention of hearing any argument before hearing the gunshots. She testified that no weapons were found on the victim or in the area where he was laying.

The parties stipulated that the gun seized from the shed fired the shots that killed the victim.

The defense re-called Ms. Atkinson, who testified that she was living at Odyssey House because of an alcohol addiction. She testified that she did not know why Mr. Scott was living at the Odyssey House. The defense then rested, and the State did not call any witnesses in rebuttal.[28]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to

---

[28] *State v. Beasley*, 2012 WL 6619325, at *1-4 (footnotes in original).

the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court

15

"identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A.  *Exclusion of Evidence Regarding Victim's Prior Conviction*

Beasley asserts that the trial court improperly excluded evidence at trial regarding the victim's prior attempted murder conviction in violation of Beasley's due process right to

present a defense.    On direct appeal, the Louisiana Fourth Circuit denied that claim,

holding:

> By his remaining assignment of error, Beasley contends that the district court
> erred by not allowing him to present evidence of the victim's prior conviction
> for attempted murder. He asserts that the district court should have allowed
> him to introduce the certified copy of the victim's prior conviction and ten-
> year sentence for attempted murder in order to show the violent character of
> the victim, and to support his contention that he shot the victim in self-defense.
> He points out that the victim had an extensive criminal background, while he
> had none, and evidence of the victim's prior conviction for attempted murder
> was relevant to show that the victim was violent. He asserts that this
> information was essential to his claim of self-defense to show his state of mind
> when he shot the victim.
>
> The trial transcript indicates that on the first day of trial, defense counsel
> sought a continuance because he had just learned that the victim had recently
> been released from Angola prison. Counsel noted that he was unaware of how
> many convictions the victim had because the State had not produced his rap
> sheet. When the prosecutor stated that it was the State's policy not to turn over
> a witness' rap sheet until he testified, the court pointed out that the victim,
> who was dead, would not be testifying, and it ordered the State to produce the
> victim's rap sheet. Defense counsel renewed his motion for a continuance,
> noting that he might still need extra time depending upon what was in the rap
> sheet. The court denied the motion, noting that if counsel was trying to show
> the victim's reputation for violence, he could have already discovered this by
> interviewing people in the neighborhood. The court also noted that this was
> the first time that it had heard that the State had not provided the victim's rap
> sheet. Counsel then re-urged his motion for a continuance, asserting that he
> wanted to go to Angola to get a certified penitentiary pack, which indicated
> that the victim had just been released from Angola for an attempted murder.
> Counsel noted that he wanted to investigate this issue, possibly calling defense
> witnesses. The court offered to issue any instanter subpoenas, but counsel
> noted he did not know who these witnesses would be. The court denied the
> motion.
>
> On the second day of trial, during the cross-examination of the victim's sister,
> Ms. Scott, defense counsel sought to introduce exhibit D–1, a Bureau of
> Identification photograph of the victim. During a bench conference that

followed the State's objection to this exhibit, the court noted that the jury was already aware that the victim had just been released from jail at the time of the shooting. The court allowed the defense to show the photograph, but it ruled that the portion of the exhibit that included the victim's rap sheet information would need to be covered unless the defense called the custodian of the record to authenticate it.

Later on the same day, during his cross-examination of Det. Barnes, counsel asked her if she had run the victim's rap sheet. At a conference in chambers following the State's objection, the court acknowledged that counsel was attempting to show the victim's dangerous character, but it noted that the officer would not know of the victim's reputation in the community. Defense counsel noted that Beasley's statement made allegations of the victim's propensity for violence and that Beasley was afraid of him. The court replied that counsel needed to call Beasley or others in the community who would know of the victim's reputation. Counsel noted that he did not intend to call Beasley, and the court ruled that he could not question Det. Barnes, who had no knowledge about the victim's prior criminal record or about the content of his rap sheet.

Finally, on the third day of trial, at a bench conference, defense counsel noted his objection to the court's refusal to allow him to introduce evidence of the victim's prior conviction, and he proffered a certified copy of the victim's conviction for attempted second degree murder, and his rap sheet showing arrests for battery and purse snatching.

The Louisiana Supreme Court discussed a defendant's right to present a defense in *State v. Van Winkle*, 1994–0947, pp. 5–6 (La. 6/30/95), 658 So.2d 198, 201–202:

> A criminal defendant has the constitutional right to present a defense. Due process affords the defendant the right of full confrontation and cross examination of the State's witnesses. It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
> * * *
> Evidentiary rules may not supersede the fundamental right to present a defense. (Citations omitted).

*See also Sartain*, 2008–0266 (La. App. 4 Cir. 12/30/08), 2 So.3d 1132; *State v. Stukes*, 2005–0892 (La. App. 4 Cir. 10/25/06), 944 So.2d 679.

In *Stukes*, this Court found that the district court did not err by disallowing the defendant to call his wife to the stand to testify as to what the defendant told her when he arrived home after leaving a bar where he shot two men. The defendant acknowledged shooting the men, but he insisted that he only did so because one of the men pulled a gun on him. According to one of the victims, his female companion, and a disinterested witness, after arguing with one of the victims, the defendant went to a nearby car and retrieved the gun that he used in the shooting. In contradiction to the State's witnesses who testified that the victims were unarmed, one defense witness testified that she heard the defendant say prior to the shooting: "If you're going to shoot me, shoot me," and that she saw the man with whom the defendant was arguing reach under his shirt for a silver object. After conviction, the defendant filed a motion for new trial, alleging that the court's failure to allow the defendant's wife's testimony denied him a right to present his defense by showing his reasons for disposing of the gun and his clothing after the shooting. The district court granted the new trial, but our Court reversed, noting that the defendant's wife's testimony would have been merely cumulative to his testimony. In support of this finding, this court discussed earlier cases:

> In *State v. Cosey*, 1997–2020 (La. 11/28/00), 779 So.2d 675, the defendant was charged with the rape and murder of a twelve-year-old girl. A man who lived across the street from the scene of the crime implicated the defendant. The trial court refused to allow the defendant to introduce evidence of the man's history of violent criminal behavior and the fact that the man killed himself after murdering his baby and the baby's mother in order to show that man could have committed the crime. The Court upheld the trial court's ruling, noting that the man's prior crimes were not similar to the present one and that the defendant was able to show that the man made obscene phone calls to the victim's mother. In addition, the defendant was able to question police officers about their failure to investigate the man, even though he lied to the police, gave them false leads, and was seen with the defendant on the night of the murder, although there was no evidence to tie him to the crime scene.
>
> * * *
>
> In *State v. Short*, 1994–0233 (La. App. 4 Cir. 5/16/95), 655 So.2d 790, the defendant was charged with the aggravated rape of his stepdaughter. He wanted to present evidence to show: (1) that his wife was having an affair and was spending his paychecks while he was offshore; (2) that the

victim liked the new boyfriend better than she liked him; and (3) that several other men, including the new boyfriend, had access to the victim. The defense was not allowed to delve into these matters, and the defendant was convicted. On appeal, this court rejected his claim that he was denied the right to present a defense. The court noted the defendant was allowed to question the victim concerning her bias against him, including her wish that the defendant and her mother were not married and her wish to live elsewhere. In addition, the defendant was allowed to testify that the victim had made a similar accusation against her mother's former husband, and he was allowed to establish the existence of her mother's boyfriend at the time of the alleged rape.

In *State v. Judge*, 1999–1109 (La. App. 3 Cir. 3/1/00), 758 So.2d 313, the defendant was accused of sexual battery. The trial court refused to allow the defense to present evidence that the victim had told a police officer that she had been raped a few years earlier, but she had not reported the crime. The defendant proffered the victim's testimony, wherein she testified an ex-boyfriend had raped her a few years earlier, but she did not tell anyone until much later that it had happened. On appeal, the defendant contended the trial court erred by not allowing this evidence to be presented to the jury. The appellate court found no error.[29]

*State v. Stukes*, 2005–0892 at pp. 16–20, 944 So.2d at 689–690.

Here, Beasley sought to introduce evidence of the victim's prior conviction for attempted murder and his rap sheet pursuant to La. C.E. art. 404A, which provides in pertinent part:

A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
* * *
(2) Character of victim. (a) Except as provided in Article 412 [not applicable here], evidence of a pertinent trait of character, such as a

---

[29] *See also State v. Washington*, 1999–1111 (La. App. 4 Cir. 3/21/01), 788 So.2d 477, where this court found that the trial court did not err in granting a motion in limine prohibiting the defense from questioning the arresting officer about allegations made in a newspaper article concerning misconduct by the officer for which he had not been charged.

> moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible ...[30]

This Court discussed the use of character evidence with respect to the victim of a crime in *State v. Williams*, 1996–1587, pp. 7–8 (La. App. 4 Cir. 4/16/97), 693 So.2d 249, 253–254:

> When a defendant pleads self-defense, evidence of the victim's dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant's fear of danger was reasonable. *State v. Edwards*, 420 So.2d 663, 669 (La.1982); *State v. Montz*, 1992–2073 (La. App. 4th Cir.2/11/94), 632 So.2d 822, 824–825, *writ denied*, 1994–0605 (La. 6/3/94), 637 So.2d 499.

> For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm. *State v. Gantt*, 616 So.2d 1300, 1304 (La. App. 2nd Cir.1993), *writ denied*, 623 So.2d 1302 (La.1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm. *Edwards, supra* at 669.

> Once evidence of an overt act is established, evidence of the victim's threats to the defendant and of the victim's dangerous character are admissible: (1) to show the defendant's reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor. *Edwards, supra* at 670.

> If the purpose is to show the defendant's reasonable apprehension of danger, it must be shown that the defendant knew of the victim's prior threats or reputation. *Edwards, supra*, at 670; *State v. Eishtadt*, 531 So.2d 1133, 1135 (La .App. 4 Cir.1988). Once this knowledge is established,

---

[30] The remainder of 404(A)(2), dealing with prior acts against a defendant in a domestic setting, is not applicable to the facts of this case.

> evidence of the victim's character, both general reputation and specific threats or acts of violence against the defendant are admissible. *Edwards, supra*, at 670.

> If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim's prior acts or reputation. *Eishtadt, supra* at 1135.

*See also State v. Williams*, 1999–1581 (La. App. 4 Cir. 6/14/00), 766 So.2d 579. And see *Sartain*, where this Court found that the district court did not err by refusing to allow the defendant to introduce evidence that the victim shot him two years before the murder because the only evidence of this shooting was the defendant's own self-serving testimony, and because other testimony brought out this fact for the jury.

Here, the only ruling of the district court to which Beasley now assigns error was the refusal of the court to allow the introduction of the victim's prior attempted murder conviction and his rap sheet. Beasley's statement, which was played for the jury, set forth evidence of prior threats to him by the victim, evidence of which was admissible. Nonetheless, the fact of Mr. Scott's prior attempted murder conviction and his prior arrests were not admissible under art. 404A, because there was no showing that Beasley knew of the prior conviction and arrests. As per the cases cited above, this evidence would only be admissible to show a basis for Beasley's fear of the victim, and if he did not know of the prior conviction or arrests of the victim, they could not be grounds for his fear. The defense presented no evidence that Beasley knew of the prior attempted murder conviction of the victim, as well as his arrests for battery and purse snatching at the time that he shot him. He made no mention of these convictions in his statement to the police, although he did mention his prior arguments with the victim and that the victim pulled a gun on him a few days before the shooting. Indeed, defense counsel admitted on the first day of trial that he had not received a rap sheet on the victim, and when he did receive it, he requested a continuance in order to investigate its contents. Without any showing that Beasley was aware of the victim's prior conviction and his arrests, evidence of these convictions was not admissible pursuant to art. 404A and its jurisprudence. Thus, the district court did not err by refusing to allow Beasley to introduce this evidence. This assignment of error has no merit.[31]

---

[31] *Beasley*, 2012 WL 6619325, at *7-11 (footnotes in original).

To the extent that Beasley is attempting to argue that the state court misapplied state law on this issue, that claim is not cognizable on federal habeas review.    A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."    *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); *see also Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law); *accord Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle*, 502 U.S. 62, 67–68 (1991)); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)); *see also Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).    Federal habeas review is limited to errors of constitutional dimension and federal courts do not sit to review the mere admissibility of evidence under state law.    *Estelle*, 502 U.S. at 67-68; *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011).

Beasley's federal constitutional claim also lacks merit.    The states are free to implement procedures regarding the admission or exclusion of evidence, provided those procedures do not infringe on a constitutional guarantee.    *Burgett v. Texas*, 389 U.S. 109, 113–14 (1967); *Pemberton v. Collins*, 991 F.2d 1218, 1223-24 (5th Cir. 1993); *Nees v. Culbertson*, 406 F.2d 621, 625 (5th Cir. 1969); *Tillman v. Thaler*, No. A–09–CA–582–SS, 2010 WL 2731762, at *13 (W.D. Tex. July 9, 2010).    In this case, Beasley's claims that the trial court improperly excluded the victim's prior attempted murder conviction will not support

federal habeas corpus relief unless the state-court evidentiary ruling violated due process to the extent it rendered Beasley's criminal proceedings fundamentally unfair. *Lisenba v. California*, 314 U.S. 219, 236–37 (1941); *Gonzales v. Thaler*, 643 F.3d at 430; *see Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right").

The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, the opportunity to do so is not absolute. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Broad latitude is granted to states to establish rules excluding evidence from criminal trials. *Id*. at 324; *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). The Supreme Court has "[o]nly rarely [...] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. at 509 (citations omitted). The Court has instead recognized that the Due Process Clause does not guarantee the right to introduce all evidence the defendant deems relevant, because the right to present even relevant evidence is not "absolute." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).

Beasley claims that he was unable to present a viable self-defense argument without evidence of the victim's prior attempted murder conviction. However, the record shows that Beasley effectively presented his self-defense theory by relying on his own detailed

statement made to Detective Barnes about his interactions with the victim and prior threats the victim made towards him.[32]    The statement was played for the jury at trial.    Defense counsel also cross-examined Detective Barnes extensively about an application for a search warrant that referenced someone possibly hearing Beasley and the victim arguing just before the shooting.[33]    He was able to question Barnes about her testimony in this regard given at a pretrial suppression hearing when asked about the affidavit for the search warrant.    As the defense outlined in its opening statement, the evidence supported his defense that he feared the victim based on past interactions between them and that Beasley rightfully felt threatened by him the morning he shot the victim.[34]

The jury obviously accepted other evidence presented at trial that contradicted Beasley's self-defense argument.    The victim's girlfriend testified at trial that she did not tell police she witnessed or heard an argument between the victim and Beasley and insisted she heard no argument before the shooting.    Detective Barnes testified at trial that she did not recall any witness telling her about an argument between the two men.    Even Beasley himself advised police that only words were exchanged; the victim did not have a gun in his possession and no physical interaction occurred before Beasley shot him.

Beasley has not shown that his trial was rendered fundamentally unfair by the

---

[32]    *See State v. Beasley*, 2012 WL 6619325, at *3-4.

[33]    *Id*. at *4, State Rec., Vol. 6 of 9, Trial Transcript, pp. 170-183.

[34]    State Rec., Vol. 5 of 8, Trial Transcript, p. 110.

exclusion of the victim's prior attempted murder conviction.    The defense was able to suggest the victim's proclivity for threats of violence toward him and others in the neighborhood through Beasley's statement played for the jury in which he discussed his personal knowledge regarding the victim's character and specific interactions he had with the victim before the incident.    Moreover, Beasley was fully able to present the theory that he acted in self-defense when he shot the victim because he feared the victim was going to kill or harm him and might go back inside the apartment for a gun.    The jury simply rejected his self-defense argument.    The evidence regarding the victim's prior attempted murder conviction was inadmissible under state law, as determined by the intermediate state court of appeal, and would add little to his self-defense theory when the statement offered by Beasley was already considered, there is nothing to establish that Beasley himself had knowledge of the victim's prior conviction when he shot him, Beasley candidly admitted the victim was not in possession of a gun at the time of the shooting, and there was no physical interaction between them before the shooting took place.    Because evidence concerning the prior conviction was inadmissible under Louisiana law, and he has not shown that the state evidentiary rules serve no legitimate purpose or are disproportionate to the ends that they are asserted to promote, Beasley has not shown that the trial court's rulings deprived him of his due process right to a meaningful opportunity to present a complete defense. *Lyons v. Vannoy*, Civil Action No. 17-4621, 2018 WL 2944631, at *11-12 (E.D. La. May 14, 2018) (citing *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)), *adopted* 2018 WL 2938309

(E.D. La. June 12, 2018).    He is not entitled to relief on this claim.

## B. *Sufficiency of the Evidence*

Next, Beasley claims that the State did not present sufficient evidence to support the

conviction.    The Louisiana Fourth Circuit Court of Appeal rejected the claim, holding:

> By his second assignment of error, Beasley contends that the evidence adduced at trial did not support the jury's verdict. Specifically, he argues that the evidence did not show that he had the specific intent to kill or inflict great bodily harm on the victim. He further asserts that the evidence did not show beyond a reasonable doubt that he did not shoot the victim in self-defense.

> In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). *See also State v. Brown*, 2003–0897 (La. 4/12/05), 907 So.2d 1; *State v. Batiste*, 2006–0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810; *State v. Sykes*, 2004–1199 (La. App. 4 Cir. 3/9/05), 900 So.2d 156. In addition, when the State uses circumstantial evidence to prove the elements of the offense, "La. R.S. 15:438 requires that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." ' *State v. Neal*, 2000–0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657. *See also Brown*; *Batiste*; *Sykes.*

> In the matter sub judice, Beasley was convicted of second degree murder, which is defined by La. R.S. 14:30.1 in pertinent part as: "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm". Beasley does not dispute that he shot the victim, but he maintains that he did so in self-defense.

> This Court discussed self-defense in *State v. McClain*, 1995–2546, pp. 8–9 (La. App. 4 Cir. 12/11/96), 685 So.2d 590, 594:

> > A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or

receiving great bodily harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Lynch*, 436 So.2d 567 (La.1983); *State v. Brumfield*, 93–2404 (La. App. 4th Cir. 6/15/94), 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. *State v. Dozier*, 553 So.2d 911 (La. App. 4th Cir.1989), *writ denied* 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *Id.*

*See also State v. Ray*, 2010–1126 (La. App. 4 Cir. 6/29/11), 70 So.3d 998; *State v. Sartain*, 2008–0266 (La. App. 4 Cir. 12/30/08), 2 So.3d 1132.

Here, the victim sustained two gunshot wounds, one through the upper chest and one through the groin. The forensic pathologist testified that the shots were fired from more than two feet away from the victim, due to the lack of stippling. Beasley acknowledges that he shot the victim, but he insists that the evidence is insufficient to support his conviction because the State did not prove that he had the intent to kill or inflict great bodily harm on the victim. However, the fact that he shot the victim in the chest and the abdomen shows the intent to at least cause the victim great bodily harm. *See State v. Newman*, 2003–1721 (La. App. 4 Cir. 7/7/04), 879 So.2d 870. Yet Beasley argues that the State did not disprove that he shot the victim in self-defense. In support thereof, he points to his statement to the police, wherein he stated that he and the victim had argued a few days prior to the shooting, at which time the victim had pulled a gun on him. He had also said that the victim became enraged because Beasley would not sell drugs to or for him, that the victim yelled at everyone in the neighborhood, and that he feared for the safety of his girlfriend and his young daughter. He insisted that he and the victim argued just prior to the shooting, and he first stated that he shot the victim because the victim looked like he was going to pull his gun on him. Beasley later said in the same statement, however, that he shot the victim because he believed that the victim was going to get his gun from inside his house.

By contrast, Ms. Atkinson testified that the victim left the apartment, and

almost immediately she heard the gunshots. She denied hearing any argument between the victim and anyone else prior to the shooting, and she testified that the victim's keys were still in the door when she went downstairs immediately after hearing the gunshots and seeing Beasley running away with the gun in his hand. Although the jury was aware that at least the affidavit for the search warrant for Beasley's residence mentioned that a witness heard an argument prior to the shooting, Ms. Atkinson steadfastly denied that she heard any argument.

Beasley asserts that Ms. Atkinson's testimony was not credible. He points to the fact that Ms. Atkinson had been found incompetent to proceed in an unrelated case at some point prior to trial in this case, and he argues that for this reason her testimony was untrustworthy. However, Ms. Atkinson explained that at the time she was found incompetent, she was very depressed. She insisted that she had regained her competency by the time of Beasley's trial and fully understood the judicial proceedings at that time. While Beasley argues that depression would not constitute incompetency to testify, there is no indication that he tried to bar her testimony on the ground that she was incompetent to testify at his trial.

Beasley also points to Ms. Atkinson's testimony that she did not see the victim drinking on the morning of the shooting, and that the victim was in a good mood because he was going to the dentist to get new teeth. He posits that it was implausible that the victim would have a blood alcohol level of 0.251 if he was intending to go to the dentist. He also references Ms. Atkinson's testimony that he sold crack cocaine in the neighborhood, and he points out that her testimony on this point is suspect because she admitted that she had a cocaine addiction.

Despite these factors, the jury found Ms. Atkinson's testimony credible, including her assertion that the shooting occurred within a minute of the victim's departure from the apartment and that she did not hear any argument between the victim and anyone else between the time the victim left the apartment and when he was shot. A fact finder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. *State v. Johnson*, 2009–0259, p. 7 (La. App. 4 Cir. 9/16/09), 22 So.3d 205, 2104; *State v. Huckabay*, 2000–1082 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093. The latter situation is not present here. The jurors were aware of prior cocaine abuse by Ms. Atkinson and her incompetency finding, but they found her testimony concerning the shooting more credible than the version of the

shooting that was presented through the statement to the police by Beasley. Such a finding was not contrary to the evidence presented. Counter to the argument presented by Beasley, the evidence presented by the State, through the testimony of Ms. Atkinson, disproved Beasley's defense that he shot the victim in self-defense. Thus, the jury could find beyond a reasonable doubt that Beasley was guilty of second degree murder. This assignment of error has no merit.[35]

Claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).    In *Jackson*, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."    *Id.* at 319.    Accordingly, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' "    *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (emphasis added).

In this case, Beasley conceded that he killed the victim, but claimed that he was not guilty because he acted in self-defense.    The defense theory was supported by Beasley's own detailed statement explaining why he had reason to fear the victim based on their past interactions.    The defense also suggested that a witness may have heard a verbal argument precede the shooting as mentioned in the affidavit in support of the search warrant, although this assertion was denied by Ms. Atkinson and Detective Barnes.    Beasley contends he was

---

[35]    *State v. Beasley*, 2012 WL 6619325, at *5-7 (footnote omitted).

convicted of second-degree murder "based solely upon the testimony of [the victim's] girlfriend, Donette Atkinson."[36]    Although he acknowledges that Ms. Atkinson's testimony contrasted sharply with the defense theory, he believes that the jury should have rejected her testimony because she was not a reliable or credible witness.    He alleges that her testimony "was problematic and fraught with credibility problems in several areas."[37]    For this reason, he argues that the State offered no credible evidence to refute that he acted in self-defense.

In the instant case, the jury weighed all the evidence presented, including the testimony offered by Ms. Atkinson, and rejected the defense theory that Beasley shot the victim in self-defense.    Despite being presented with Ms. Atkinson's shortcomings, as outlined by the intermediate court of appeal,[38] the jury obviously found the State's witnesses credible.    Where a petitioner's insufficient evidence claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief.    *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); *McCowin v. Scott*, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26,

---

[36]  Rec. Doc. 3, p. 28.

[37]  *Id.* at 30.

[38]  *State v. Beasley*, 2012 WL 6619325 at *2.

1994); *Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), *adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012); *Picou v. Cain*, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).    Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.    *United States v. Young*, 107 F. Appx 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").    When the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational.    Beasley is not entitled to relief on this claim.

C.   *Ineffective Assistance of Trial Counsel*

Finally, Beasley claims that counsel denied him the right to testify in his own defense at trial.    The state district court considered and rejected the claim Beasley raised on post-conviction relief that trial counsel was ineffective for allegedly interfering with his right to testify at trial.    The district court found that he failed to show that defense counsel interfered with his desire to testify.    The appellate court likewise denied relief finding Beasley did not rebut the presumption that he knowingly and voluntarily waived his right to testify.    The Louisiana Supreme Court denied relief without additional stated reasons. The claim was properly exhausted in the state courts.

A criminal defendant has a fundamental constitutional right to testify in his own behalf at trial.    *See Rock v. Arkansas*, 483 U.S. 44, 49–52 (1987).    The claim that trial counsel interfered with a defendant's right to testify is properly raised in the context of a claim of ineffective assistance of counsel.    *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002), *cert. den.*, 541 U.S. 1031 (2004) (citing *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001)).

In order to prove ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984).    If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"    *Lockhart v.*

*Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

Because the claims were adjudicated on the merits in state court, habeas relief is available only if that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.    28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86 (2011).    "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."    *Richter*, 562 U.S. at 105 (citations omitted).

Here, the state-court decision rested in part on the fact that Beasley's allegation *i.e.,* that he expressed a desire to testify and counsel refused was unsubstantiated and conclusory.    "[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand."    *Turcios v. Dretke*, Civ. Action No.

97-0515, 2005 WL 3263918, at *6 (S.D. Tex. Nov. 29, 2005) (citing *Underwood v. Clark*, 939 F.2d 473, 475-76 (7th Cir. 1991)); *accord Jones v. Cain*, Civil Action No. 10-213, 2010 WL 5375949, at *3 (E.D. La. Dec. 17, 2010) (Vance, J.); *Davis v. Quarterman*, Civil Action No. 06-3606, 2007 WL 1886272, at *6 (S.D. Tex. June 29, 2007).    In addressing the need for a petitioner to substantiate a claim that he was denied the right to testify by his counsel, the United States Seventh Circuit Court of Appeals explained:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
>
> [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary—and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Underwood v. Clark*, 939 F.2d at 475-76.    The United States Fifth Circuit Court of Appeals has cited favorably the rationale set forth in *Underwood* recognizing "[c]ourts have observed that allowing a bare assertion of a right-to-testify violation to precipitate the further investment of judicial resources is problematic."    *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999) (quoting *Underwood*, 939 F.2d at 476) (a conclusory assertion by a defendant that his right to testify was denied him is insufficient to require a hearing because

"[i]t just is too facile a tactic to be allowed to succeed").    Consequently, Beasley's mere assertion that defense counsel prohibited him from testifying at trial will not suffice to prove counsel interfered with his right to testify.

Furthermore, the record does not reflect that Beasley was denied the right to testify. On two occasions, defense counsel commented, with no objection or assertion otherwise by Beasley, that he did not intend to have Beasley testify.[39]    Beasley's acquiescence indicates that he was aware of and agreed to the strategy proposed by counsel in advancing the self-defense argument.    Beasley cites one specific exchange that took place during the second day of trial as purported evidence that counsel refused him the right to testify.[40]    Although he asserts that the denial may be implied from the exchange, the record does not support his assertion.    The record itself shows that on the second day of trial, the trial court held an in-chambers discussion after defense counsel attempted on cross-examination to question Detective Barnes about the victim's rap sheet.    During the discussion, the trial court noted that in order to get the violent propensity of the victim into evidence, defense counsel would need to call either the defendant or someone who knows about specific instances of violent acts by the victim such as other persons from the neighborhood.[41]    The trial judge stated,

---

[39]    State Rec., Vol. 5 of 8, Trial Transcript, p. 110; State Rec., Vol. 6 of 8, Trial Transcript, p. 189.

[40]    Rec. Doc. 3, pp. 32-33; State Rec., Vol. 6 of 8, Trial Transcript, pp. 185-190.

[41]    The trial court engaged in a similar discussion with defense counsel at the start of trial when it denied his request for a continuance based on the defense recently obtaining

"It appears to me that you don't intend to call your client to the stand."    Defense counsel replied, "No, I don't."    The trial judge explained that he would need to find some other witness.    Contrary to Beasley's argument, the exchange does not show that "his right to testify was in some fashion abridged, that he were [sic] not either given an opportunity to testify, or in some ways he were [sic] convinced not to testify in the case" or that "defense counsel made the decision not to allow Beasley on the stand to testify on his own behalf, and that decision was made without Beasley's consent."[42]    Instead, it seems that Beasley was fully aware of defense counsel's strategy that he not testify at trial and simply acquiesced. Again, the only evidence offered is Beasley's unsupported allegation in his memorandum in support as to what purportedly transpired between him and defense counsel.

Furthermore, Beasley has not shown that counsel's advice against testifying was objectively unreasonable or resulted in prejudice.    A decision whether or not to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight."    *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985); *accord United States v. Mullins*, 315 F.3d at 453; *Amos v. Cain*, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); *Curtis v. Cain*, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008).    Such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters

---

the victim's rap sheet. State Rec., Vol. 5 of 8, Trial Transcript, p. 9.

[42]  Rec. Doc. 3, p. 33.

of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.    *Strickland*, 466 U.S. at 689.    Here, there was no reason to put Beasley on the stand to expound on his perceptions or present "his side of the story" when the jury heard Beasley's recorded statement in which he related the incidents with the victim that not only instilled fear in Beasley, but made him believe that the victim wanted to kill him.    As Beasley concedes in his brief:    "Even though his choice of words in his statement ... may have reflected questionable character, it did not reveal evidence that Beasley shot Scott for no apparent reason. *The statement revealed what Beasley wanted the jury to know* Scott had been threatening his life and calling him names because he refused to deal or give him drugs."[43]

Defense counsel's advice against testifying under the circumstances was objectively reasonable.    Beasley alleges that his testimony would have countered the State witnesses and provided "exculpatory and mitigatory factors... sufficient enough to support a different outcome at trial."[44]    However, in doing so, he would have been subjected to extensive cross-examination, which very likely would have undermined his own credibility.    Instead of having him testify, defense counsel at the outset wisely sought to rely on Beasley's prior statement that included the relevant details he wanted the jury to know and to establish

---

[43]  Rec. Doc. 3, p. 37 (emphasis added).

[44]  *Id.*

inconsistencies and flaws in the State's case based on thorough cross-examination of Ms. Atkinson and Detective Barnes.[45]     Beasley offers nothing to refute that defense counsel strategically considered the potential harm that plainly could outweigh any benefit his repetitive testimony might have provided the defense when he advised against taking the stand, and that Beasley acquiesced at the time, accepting the learned advice of counsel that he now, in hindsight, believes regrettable.     Moreover, Strickland's prejudice prong requires a reasonable probability that but for counsel's advising him not to testify, the result of the proceeding would have been different.     *Strickland*, 466 U.S. at 694–95.     Beasley has not demonstrated that the outcome of the trial would have been any different but for counsel's decision to present the self-defense theory without Beasley testifying at trial.

As the state courts reasonably concluded, Beasley's allegations that defense counsel denied him the right to testify are unsupported.     He has not established that counsel's advice against testifying was unreasonable or that the outcome of the trial would have been any different but for counsel's advising against Beasley testifying at trial.     For these reasons, Beasley has not demonstrated that the state court's decision rejecting the ineffective-assistance-of-counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[45]  State Rec., Vol. 5 of 8, Trial Day 1 (Opening Statement), p. 110.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Beasley's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[46]

New Orleans, Louisiana, this __24th__ day of _____January_____, 2020.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[46]    *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.